# BLUNT EXHIBITS

# PART #2

-12-

11.3   Damages:  The rights of the Authority under this Article 11.
       are in addition to, and not in limitation of, its right
       to terminate this Operating Agreement without cause
       pursuant to Article 2.2.  If this Operating Agreement is
       terminated for any reason, Operator shall remain liable
       for any and all base rates, fees, charges, interest,
       costs, assessments, fines and damages which may be due
       hereunder or sustained as a result of the Operator's
       operations at Logan Airport and all costs, fees and
       expenses (including, without limitation, reasonable
       attorneys' and experts' fees and other expenses) incurred
       by the Authority in pursuit of its remedies hereunder.


ARTICLE 12 - MISCELLANEOUS

12.1   Not A Lease.  This Operating Agreement is not a lease and does
       not give the Operator any right to the use or occupancy of
       any specific areas of Logan Airport for the conduct of its
       activities or the storage of any equipment.

12.2   Notice.  Whenever by the terms of this Operating Agreement
       notice shall or may be given, the same shall mean and
       include written notice.  Written notice shall be deemed to
       have been duly served upon the Operator when delivered to or
       at the Operator's last known business address; or when
       enclosed in a postage prepaid wrapper, or envelopes,
       addressed to the Operator's last know business address and
       deposited in a United States mail box.

       If intended for the Authority, address to:

       Ground Transportation Manager or Designee
       Massachusetts Port Authority
       Boutwell 2
       Logan International Airport
       East Boston, Massachusetts   02128

       With a copy to:

       Chief Legal Counsel
       Massachusetts Port Authority
       State Transportation Building
       10 Park Plaza
       Boston, Massachusetts   02116

       If intended for the Operator, mailing address set forth in
       Section 1.2.

-13-

12.3 <u>No Joint Venture.</u> The parties state that they have not created and do not intend to create by this Operating Agreement a joint venture or partnership relation between them but rather all services rendered pursuant to this Operating Agreement are rendered solely by Operator. Operator assumes sole responsibility for injury or damage to person or property arising out of the provision of the Permitted Services.

12.4 <u>No Waiver.</u> No waiver or failure to complain by the Authority or the Operator of any action, non-action or default on the part of the other in the performance of any of the terms, covenants, or conditions hereof to be performed, kept or observed shall be or be construed to be a waiver of any other or subsequent default in the performance of any of the terms, covenants and conditions. No Acceptance by Authority of any rates, fees, charges, or other payments in whole or in part for any period or periods after a default in any of the terms, covenants, and conditions to be performed, kept, or observed by Operator shall be deemed a waiver of any right on the part of the Authority to enforce such terms, covenants or conditions.

12.5 <u>Work in Harmony.</u> The Operator covenants that its employees at Logan Airport shall be able to work in harmony with all elements of labor employed at Logan Airport. In the event that the Authority determines that it is necessary for public safety or the efficient operation of Logan Airport to post police details or take other actions as a result of the inability of Operator's employees to work in harmony with other elements of labor employed at Logan Airport, the Operator shall reimburse the Authority for all reasonable costs incurred by the Authority in doing so.

12.6 <u>Authority Employees.</u> Operator shall not during the term of this Operating Agreement, hire or employ on either a full-time or part-time basis, any person or persons so long as such person shall be employed by the Authority.

12.7 <u>Certificate of Compliance With Certain Laws.</u> In compliance with certain provisions of state law, upon execution of this Operating Agreement, Operator shall furnish to the Authority a signed statement in the form attached hereto as Exhibit D.

12.8 <u>Non-Discrimination and Affirmative Action.</u> With respect to non-discrimination and affirmative action, Operator shall comply with all of the terms and conditions set forth in Exhibit E.

12.9 <u>No Personal Liability.</u> No member, director, officer, or employee of the Authority shall be charged personally or held contractually liable by or to Operator under any term or provision of this Operating Agreement or because of any breach thereof or because of its execution or attempted execution.

-14-

12.10 <u>Agreements With the United States.</u>  This Operating Agreement is subject and subordinate to the provisions of any agreement heretofore or hereafter made between the Authority and the United States.  The Operator shall reasonably abide by requirements of the agreements entered into between the Authority and the United States, and shall consent to amendments and modifications of this Operating Agreement if required by such agreement or if required as a condition of the Authority's entry into such agreement.

12.11 <u>Trust Agreement.</u>  The Operator acknowledges that the Authority is a party to a Trust Agreement dated as of the first day of August, 1978 between the Authority and the holders of bonds issued by the Authority and State Street Bank and Trust Company as Trustee.  The Operator agrees to consent to amendments or modifications to this Operating Agreement reasonably required in the opinion of legal counsel to the Authority who shall have recognized expertise in bond matters to assure the Authority's compliance with its obligations thereof, or with the obligations of successor or additional Trust Agreements into which the Authority may enter in the course of issuing additional or refunding bonds as permitted by law.

12.12 <u>Assignment and Delegation Prohibited.</u>  Operator shall not assign or transfer this Operating Agreement or any interest or rights herein, voluntarily or by operation of law.  Any attempted assignment or transfer of this Operating Agreement shall be void and shall, at the Authority's option, terminate this Operating Agreement.  Operator shall not delegate any of its Permitted Services, duties, or responsibilities under this Operating Agreement without the prior written approval of the Authority.  Any delegation without such approval shall be void and shall, at the Authority's option, terminate this Operating Agreement.

12.13 <u>Non-Exclusive Rights.</u>  The Operator hereby acknowledges that the rights granted under this Operating Agreement are non-exclusive and that nothing herein shall be construed as granting or authorizing the grant of an exclusive right within the meaning of 49 U.S.C. Sections 2210 and 1349, as amended, or in violation of any other provision of law.

-15-

12.14 <u>Entire Agreement/Applicable Law.</u>  This Operating Agreement constitutes the entire agreement between the parties and supersedes all prior agreements between them with respect to the subject matter of this Operating Agreement.  No subsequent alteration, amendment, change or addition to this Operating Agreement shall be binding upon the Authority or the Operator unless reduced to writing and signed by the party or parties to be charged therewith.  If any provision of this Operating Agreement shall to any extent be held invalid or unenforceable, the remainder of this Operating Agreement shall not be affected thereby unless one or both parties would be substantially and materially prejudiced thereby.  This Operating Agreement and the rights and obligations of the parties hereunder shall be governed by the laws of the Commonwealth of Massachusetts.

Executed as of the dates appearing below.

OPERATOR

By: _[signature]_
Title: _Traffic Manager_
Date: _2/23/95_

MASSACHUSETTS PORT AUTHORITY

By: _Mark C Richardson_
Title: _Manager of Transportation Services_
Date: _3-15-95_

# EXHIBIT A

## (Operational Procedures)

Exhibit A shall consist of the following documents attached hereto and as they may be changed or supplemented by the Authority, in its sole discretion, from time to time, upon twenty-four (24) hours prior notice to Operator:

1. Drop off and Pick up Procedures for Scheduled Motor Bus and Limousine Operators

2. Drop off and Pick up Procedures for Non-Scheduled Limousine Operators, Reservation Limousine Operators and Shared Van Service Operators

3. Drop off and Pick up Procedures for Charter and Tour Motor Bus Operators

4. Drop off and Pick up Procedures for Delivery Vehicle Operators

5. Drop off and Pick up Procedures for Authorized Courtesy Vehicle Operators

6. Description of Long Term Waiting Area

7. Procedures for Terminal Passenger Greeters

8. Procedures for Tour Operators

9. Map of Long Term Waiting Area

1. <u>Drop Off And Pick Up Procedures For Scheduled Motor Bus And Limousine Operators</u>

    Except at Terminal E, all scheduled bus and limousine drivers will use the second level to drop off passengers who are boarding aircraft to depart Logan Airport. At Terminal E, drop off is at the designated stop, not at the inner curb.

    After dropping off passengers, the bus and limousine drivers shall check for any items left by passengers, such as luggage, eyeglasses, clothing, etc. Any items found shall be turned into the Massachusetts State Police at Logan Airport (Terminal D).

    The scheduled bus and limousine drivers must return to the long term waiting area to wait until their scheduled time of departure, and then proceed to Terminal A and subsequent terminals to commence passenger pick ups, outbound from Logan Airport.

    The scheduled bus and limousine driver will start their outbound trip from Terminal A. They will stop at the designated limousine, bus, or courtesy vehicle stand in front of each terminal. Each driver shall announce their authorized destination and assist passengers in loading their luggage. Only one trip through the terminals is allowed. At Terminal E the scheduled bus and limousine driver shall leave Logan Airport by the most direct route.

    Scheduled service Operators performing charters shall abide by the charter and tour guidelines.

2. <u>Drop off and Pick up Procedures for Non-Scheduled Limousine Operators, Reservation Limousine Operators and Shared Van Service Operators</u>

    Non-scheduled limousine drivers, reservation limousine drivers and shared van service drivers shall drop off outbound passengers on the second level (departure) at the baggage check-in area (Terminal C drop off is the second island and Terminal E drop off is the third island). Drivers should check vehicles for lost items, which if found should be returned to the Massachusetts State Police at Logan Airport (Terminal D). If there is no scheduled pick up, drivers must leave Logan Airport by the most direct route.

    When non-scheduled service drivers are picking up passengers, the drivers must go to the long term waiting area and sign in with the Ground Transportation Agent by giving the company name, permit number, airline, time of pick-up, destination and number of passengers. At this point, a long term waiting area ticket shall be given to the drivers. This ticket should be prominently displayed on the left side of the windshield.

    Limousine and/or van drivers must wait at the long term waiting area until the flight they are meeting has arrived and passengers are ready to be picked up. Drivers may then proceed to the designated limousine, bus, courtesy or taxicab stand and load passengers and luggage.

-3-

3. <u>Drop off and Pick up Procedures for Charter and Tour Motor Bus Operators</u>

   All charter and tour motor bus drivers when dropping off passengers are required to use the departure level (except Terminal E, where passenger drop off and pick up are against the blast wall at the end of the terminal).

   For passenger pick ups, charter and motor tour bus drivers must register at the long term waiting area. Drivers must sign-in by giving the Ground Transportation Agent, the company name, permit number, airline, number of passengers, time of arrival, and destination. Tour guides or greeters may be dropped off at the terminal prior to registering.

   Drivers will wait at the long term waiting area until the flight has arrived and all passengers have claimed their luggage and are ready to board the bus. The tour guide may request the charter and tour motor bus by calling the long term waiting area at 561-1770 or by contacting the Ground Transportation Agent to call the base via radio. Drivers will stop at the designated charter bus stand, load luggage, board passengers and leave Logan Airport. Charter and tour motor bus drivers are not allowed to park and wait at the curb. Tour guides are not allowed to call for buses until all passengers are on the curb with their luggage.

4. <u>Drop off and Pick up Procedures for Delivery Vehicle Operators</u>

   All service delivery vehicle drivers will advise the Authority's Ground Transportation Unit of the amount of monthly trips made for the month, in writing.

   Courier and service delivery vehicle drivers shall park permitted vehicles at designated package and delivery stand only. The time limit is 15 minutes.

   Van or limousine drivers authorized to provide delivery vehicle service shall follow the above procedures provided that:

   o   They have a current Massport identification decal.
   o   They do not pick up passengers in the vehicle.

   Drivers are allowed to enter the terminals to pick up and/or deliver packages only.

5. <u>Drop off and Pick up Procedures For Authorized Courtesy Vehicle Operators</u>

   Courtesy vehicle drivers are encouraged to make all of their drop offs on the upper level of the terminals. Pick ups and/or drop offs at the lower level of the terminals are to be made at the designated courtesy vehicle stand only.

-4-

6. <u>Description of Long Term Waiting Area</u>

   The currently designated long term waiting area ("LTWA") is the parking area between the u-turn in front of the Central Parking Garage and the former Bay Bank Building. This is also known as the limo pool or holding area. See attached map.

   The trailer/drivers room in this area is available for use by drivers using the LTWA. The facility has restrooms, vending machines, pay phones, and a flight information display screen showing flight arrivals, delays and cancellation.

   Each driver who is authorized to conduct Permitted Services at Logan Airport shall register at the trailer/office prior to any passenger pick ups and shall obtain a ticket authorizing them to use the appropriate commercial vehicle stand.

   Scheduled motor buses and limousine drivers may utilize the trailer/drivers room but are not required to register at the trailer/office unless they are picking up a charter group.

7. <u>Procedures for Terminal Passenger Greeters</u>

   Drivers shall not be allowed to act in the dual role of driver and passenger greeter. In order to alleviate confusion, drivers and passenger greeters are requested to sign-in at the LTWA and advise the Ground Transportation Agent that a passenger greeter will be coordinating the pick up. The driver shall drop the passenger greeter off at the terminal and proceed back to the LTWA to wait for the arrival of their flight.

   Passenger greeters are required to remain on the lower level, at the baggage claim area. After making customer contact, passenger greeters may call for their limousine using their own radio or by requesting the Ground Transportation Agent to call the LTWA.

   Harassing, annoying or soliciting Logan Airport passengers by a passenger greeter is a violation of the Authority's Commercial Ground Transportation Service Rules and Regulations. Anyone found doing so will be subject to disciplinary action by the Authority.

-5-

8. <u>Procedures for Tour Operators</u>

All charter bus drivers shall register with the dispatcher at the LTWA. The bus driver shall give the dispatcher the flight number, airline name and scheduled arrival time. The dispatcher will notify the Ground Transportation Manager who will then make the required tour arrangement with the Ground Transportation Agent at the specific airline terminal.

The tour driver or guide, after meeting the tour group, and making sure that everyone has their luggage and is ready to leave Logan Airport, should approach the Ground Transportation Agent located at the designated commercial vehicle stand and request that the charter bus be sent to the terminal.

Tour guides are also encouraged to use the public address system located at each commercial vehicle stand, to assist in locating their group. The Ground Transportation Agent is in radio contact with the LTWA and a Ground Transportation Supervisor. If any difficulties arise the Ground Transportation Agent is available to provide assistance.

There are also Public Information Representatives located in Terminals A, C, and E, who are also able to contact the LTWA.

## EXHIBIT B

### OPERATING AGREEMENT
### COMMERCIAL GROUND TRANSPORTATION SERVICE BASE RATES PER TRIP

All Operators shall pay **$25.00 per month** or the number of monthly trips times the base rate per trip in effect for the current year, whichever is greater. Each Operator shall also pay applicable Operating Agreement Fees which shall consist of (i) Initial **Application Fee of $75.00** and (ii) **Annual Renewal Fee of $30.00**.

| TIME FRAME | ALL OPERATORS WITH OPERATING AGREEMENT | AUTHORIZED COURTESY VEHICLES (2) 500 Trips/Mo. and above |
|---|---|---|
| Year 1<br><br>1993 | Base Rate = $1.29 | $1.29<br>x<br>Actual # Trips<br>x<br>30% |
| Year 2<br><br>1994 | Base Rate =<br>Year 1 Rate<br>($1.29)<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips<br>x<br>60% |
| Year 3<br><br>1995 | Base Rate =<br>Year 2 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |
| Year 4<br><br>1996 | Base Rate =<br>Year 3 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |
| Year 5 (1)<br><br>1997 | Base Rate =<br>Year 4 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |

(1) To adjust Base Rates after Year 5, the Authority shall conduct public hearings. If not, then Base Rates will remain at year 5 level.

(2) For all Operators of Authorized Courtesy Vehicles making more than 500 trips per month, the Base Rate Per Trip shall be discounted by 70% in Year 1 and 40% in Year 2. In Year 1 and Year 2, each Operator shall be billed only for 30% and 60% of their monthly trips.

# EXHIBIT C



# MASSACHUSETTS PORT AUTHORITY
## INVOICE

**Please Remit To:**
MASSACHUSETTS PORT AUTHORITY
P. O. BOX 5853
BOSTON MA 02206
United States

| | |
|---|---|
| Page: | 1 |
| Invoice No: | LT00065712 |
| Invoice Date: | 01/07/2004 |
| Customer Number: | 2451 |
| Due Date: | 02/11/2004 |

**Customer:**
CONCORD TRAILWAYS
7 LANGDON STREET
CONCORD NH 03301
United States

**AMOUNT DUE:**   555.00   USD

Amount Remitted

For billing questions, please call   617-428-2800

| Line | Adj | Description | Quantity | UOM | Unit Amt | Net Amount |
|---|---|---|---|---|---|---|
| | | PERIOD BEING BILLED: DECEMBER, 2003 | | | | |
| 1 | | Limousine/Bus Trips | 1.00 | EA | 555.0000 | 555.00 |
| | | Total number of trips:  370  @ $1.50 per Trip | | | | |

**SUBTOTAL:**   555.00

**TOTAL AMOUNT DUE :**   555.00

Original

PORTRAIT

OVERDUE INVOICES ARE SUBJECT TO A FINANCE CHARGE OF 1.5% PER MONTH

# EXHIBIT D

boston.com                                    THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# Massport approves Tobin toll hike, new fees for airport taxis

The Boston Globe

## Logan buses and shuttle vans face steepest increases

By Mac Daniel, Globe Staff, 1/16/2004

Driving over the Tobin Bridge will get costlier in April. The Massachusetts Port Authority board yesterday approved boosting the $2 toll to $3 for drivers paying cash and $2.50 for those using the Fast Lane electronic toll system.

The Massport board also approved an increase in fees charged to taxis, limousines, shuttle vans, and buses that pick up and drop off passengers at Logan International Airport. Taxi fees will jump from $1.50 to $1.75 in April, and to $2 in April 2005.

Massport, which operates the airport and the Tobin Bridge, initially planned to increase the airport fee for taxis by $1, but backed off last week after 200 angry drivers threatened to block the city's bridges and tunnels to protest the higher cost, which they said would cut into tips as the ride from Logan gets more expensive.

Added to the tunnel tolls, the $1 increase would have bumped the surcharge to $7 for passengers who climb into a cab at Logan. Under the plan approved yesterday, the surcharge would rise 25 cents to $6.25 in April, and to $6.50 next year.

For other vehicles, though, cost increases will be much steeper. The fee charged to buses will triple, from $1.50 to $4.50 in April, and again from $4.50 to $7.50 in April 2005, a 400 percent increase overall.

At yesterday's Massport board meeting, a handful of local taxi drivers scoffed at the increases. Ken Hunter, vice president of Concord Trailways bus lines, said the higher costs could lead either to fewer buses going to Logan or higher fares for passengers.

"We have to go home now and mull our options," Hunter said. Concord Trailways runs 12 daily trips to Logan from Massachusetts, Maine, and New Hampshire.

The Tobin Bridge toll increase, which is expected to raise an additional $6 million to $8 million per year, will help pay for a $68 million rehabilitation of the 54-year-old bridge. Officials said it will also help offset $365 million that Massport is paying the Turnpike Authority to buy Big Dig land near Logan's tunnel entrances and exits. Tolls on the bridge were last raised in 2002, from $1 to $2.

"We've got to recover the costs," said Massport board member James M. Coull. "That's all there is to it."

The board left the resident commuter toll for residents of Chelsea and Charlestown untouched, allowing bridge neighbors to travel the Tobin for 30 cents as long as they use the Fast Lane electronic toll collection.

The amount of money the airport makes on the Tobin Bridge toll increase will depend on the number of commuters who switch to the Fast Lane electronic toll system and its built-in 50 cent discount, a perk that is expected to draw more North Shore drivers to sign up for the service, according to Massport. It is the first time that a Fast Lane discount has been used on the bridge, though a similar discount is offered to Fast Lane drivers using the Boston extension of the Massachusetts Turnpike.

Cab drivers said the increase in taxi fees, even though it is less than first proposed, will hurt an already ailing business that is only now recovering from the drop in airline traffic after the Sept. 11, 2001, terrorist attacks. Drivers also worry that passengers will tip them less, thinking that the high starting fare is going directly to the

cabbie. "Massport hasn't heard a word we've said," taxi driver Louise Samson wrote in a letter she distributed to the board. "We want Massport to collect its own tolls."

A handful of taxi drivers asked to speak at yesterday's meeting, but were denied after board members declined to second a motion by board member Susana M. Segat to suspend the rules and allow the drivers to comment.

Massport officials said the fee increase for ground transportation will help pay for maintenance of Logan's newly revamped road system.

Larry Meister, vice president of the Independent Taxi Operators Association, said members worry that no cap has been set on fee increases, allowing Massport to boost costs further after April 2005. "It leaves the door open, and I'm concerned about that," he said.

© Copyright 2004 Globe Newspaper Company.

© Copyright 2004 The New York Times Company