UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____
                                                            )
JALBERT LEASING, INC., et al.,          )          CIVIL ACTION
                                                            )          NO. 04CV-10486-RCL
                *Plaintiffs*,                    )
                                                            )
v.                                                         )
                                                            )
MASSACHUSETTS PORT AUTHORITY, )
                                                            )
                *Defendant*.                   )
_____)

**Affidavit of James Jalbert, President,
Plaintiff Jalbert Leasing, Inc. d/b/a C&J Trailways
In Support of Plaintiffs' Motion for Summary Judgment**

**Introduction**

       1.       I am James M. Jalbert, President of Plaintiff Jalbert Leasing, d/b/a C & J Trailways ("C&J"). C&J is a New Hampshire Corporation whose principal place of business is 185 Grafton Drive, Portsmouth, New Hampshire 03801.

       2.       As C&J's President, my duties and responsibilities include all aspects of the management of C&J's business. I am authorized on behalf of C&J to submit this affidavit in support of Plaintiffs' Motion for Summary Judgment filed in this matter. The statements herein are based on my personal knowledge, except as I have indicated otherwise.

       3.       I have been involved in the bus business for more than 30 years and an owner and President of C&J since 1985, and my statements are based, in part, on that experience.

**C & J Trailways**

       4.       C&J is an interstate bus company, whose primary business is operating scheduled bus service from Dover and Portsmouth, New Hampshire and Newburyport, Massachusetts to

Boston's Logan Airport and Boston's South Station. Over 50% of the company's revenue is derived from Logan Airport Service.

5. As an interstate bus company, C&J's business is regulated by the Federal Motor Carrier Safety Administration ("FMCSA"). C&J conducts its scheduled service under a Certificate issued in 1968 by the Interstate Commerce Commission in MC-134133. (When the ICC was abolished, FMCSA became the agency responsible for regulating interstate bus transportation.)

6. Currently, C&J's service is focused on transporting passengers to and from Boston's Logan Airport in scheduled service. Attached, as **Exhibit A** is a copy of C&J's current schedule, showing 17 daily trips from Portsmouth, New Hampshire and Newburyport, Massachusetts to Logan, and from Logan returning to each of those points. Each schedule is operated by one coach, which picks up or drops off passengers at the various points along the route.

7. On each scheduled trip, a C&J bus enters the Airport to drop off and pick up passengers at bus stops designated by Massport at each passenger terminal, departing at the time shown on the schedule.

8. As an example of the extent of the company's business, during February of 2004, C&J transported approximately 3,607 passengers from Logan to Newburyport, 8,417 passengers from Logan to Portsmouth. For calendar year 2003, C&J transported approximately 43,748 passengers from Logan to Newburyport and 83,412 passengers from Logan to Portsmouth.

9. To my best knowledge, during an ordinary month, well in excess of 98% of the passengers who ride C&J service to/from Logan are either riding to Logan to board a flight to an

out-of-state destination or have just deplaned from an airplane arriving at Logan from an out-of-state origin.

10. C&J has been providing scheduled bus service to and from Logan since approximately 1968.

11. Since at least 1989, C&J's operations at Logan have been subject to C&J entering into a "Commercial Ground Transportation Operating Agreement ("Agreement") with Massport. To my best knowledge, C&J's current such Agreement with Massport is that dated February 27, 1995, which remains in effect through automatic renewal. I have attached a copy of that Agreement as **Exhibit B.**

12. To my best knowledge, Massport will not allow a bus company to provide scheduled bus service to and from Logan unless and until it has entered into a similar agreement to that in Exhibit B.

13. The Agreement contains a number of items which relate to this lawsuit. In particular, there are several provisions relating to charges assessed against C&J. As examples, ¶4.2 makes reference to "other charges" which Massport imposes in addition to "base rates"; ¶4.3 makes reference to "fees, charges or base rates"; ¶4.4 makes reference to "fees" and "charges"; and ¶4.7 refers to "other charges related to or incidental to the conduct of [C&J's] activities at Logan Airport." Also ¶11.3 lists the different types of payments for which C&J may be liable as "base rates, fees, charges, interest, costs, assessments, fines, and damages."

14. I have attached as **Exhibit C** a copy of a November 3, 1992 letter from Massport to C&J, describing the fee as one assessed based on the number of scheduled trips. To my best knowledge, that's the basis on which Massport continues to impose this fee or charge.

3

15. As has been the case until the present, under the Agreement C&J has been charged by Massport $1.50 for each scheduled departure. C&J now believes this is the type of charge, which is prohibited by the Federal law under which we are suing, §14505.

16. The $1.50 per charge is assessed on each departure where C&J is carrying passengers. The charge is assessed by Massport, which appears to be a public entity.

17. Attached as **Exhibit D** is a copy of the January 7, 2004 Massport invoice relating to this charge for December 2003. The invoice shows that this is a separate billing, with charges assessed on a "per trip" basis. The charge for December was $469.50. For 2003, C&J paid a total of $5,638.50 to Massport for this fee.

18. This $1.50 per trip charge has been in effect for a number of years. In January 2004, Massport announced that it would triple the charge to $4.50 per trip effective April 4, 2004, and then increase it again to $7.50 per trip effective April 4, 2005.

19. With this per trip charge to be tripled in a matter of days, C&J will be harmed significantly, no matter what we may do.

20. To the extent that C&J might try to absorb the increased charges by not passing them along to our passengers, this would seriously impact our company. As an interstate bus company, C&J is confronted with higher costs at every turn. Quickly increasing fuel and high insurance costs are major concerns. (As an interstate carrier, C&J must by Federal regulation maintain at least $5 million automobile liability coverage). Most all expenses associated with operating a bus business are also at very high levels or increasing. To incur the expense from tripling the departure fee, without any corresponding increase in revenues, would seriously impact our bottom line. Since C&J specializes almost exclusively in service to Logan, these increased charges would be a major threat to our continued well being.

21.     To the extent C&J might try to pass along the increase by raising fares, we believe we would lose passengers and their revenue. In my experience, C&J's passengers are not low income, but they are still very price sensitive.  To my knowledge, almost everyone who uses C&J's service to and from Logan has a viable transportation option, whether it is driving themselves or having someone else drive them. Another option is airport shuttle service.  C&J is in competition with many such companies, including some services we believe are subsidized by Massport.  There is a point at which the convenience of one's own auto or an airport shuttle outweighs the cost of bus transportation which is always slightly less convenient, since it is neither door to door nor does it operate exactly at the passenger's requested time.  We believe that an increase in fares from the new Massport charge and corresponding reduction in ridership would result in a net revenue loss.  Since the Massport fee is fixed, as ridership decreases, the fee measured on a per person basis actually increases.

22.     Also, to the extent C&J loses riders who choose to use private autos instead, this would serve to frustrate the region's efforts to reduce air pollution by increasing the use of commercial transportation, such as buses.  This outcome would be ironic, since Massport has sought out regular route bus companies to perform scheduled frequent services to and from Logan for full fare and discounted commuter travelers and also as a means to improve air quality so as to support the continued expansion and development of the Airport.  I have attached as **Exhibit E** a copy of the first page of the "Ground Transportation Operator Marketing Agreement" between Massport and C&J, which was in effect during 1992.  That agreement was a predecessor to the current Agreement.  One of the stated purposes in that agreement was to substitute buses for autos "in order to reduce congestion and improve air quality."

23.    Finally, to the extent C&J loses riders who choose to use private autos instead, this would serve to frustrate the national goal of promoting intermodal transportation, i.e., bus to air. From my company's membership in the National Trailways Bus System, I am aware of these national goals.

24.    I have previously stated the $1.50 per trip charge has been in effect for a number of years, and C&J never challenged it in the past. One reason we never challenged is that we were not aware of §14505. Also, since we were used to the charge of $1.50 per departure and since it was a relatively low amount, there didn't seem to be enough at stake to incur the cost of challenging it in court.

25.    In January 2004, Massport announced that it would triple the amount to $4.50 per trip effective April 1, 2004, and then increase it again to $7.50 per trip effective April 1, 2005. At these amounts, the charge becomes much more significant.

**Verification**

I, James Jalbert, President, Jalbert Leasing, d/b/a C & J Trailways, verify under penalty of perjury under the laws of the United States of America that I have read the foregoing statement, that I am qualified and authorized to make that statement, and that all the information therein is true and correct.

"/s/ _____"
James Jalbert

Dated:   March 16, 2004