# JALBERT EXHIBITS

# PART #2

-10-

## ARTICLE 10 - AIRPORT OPERATIONS

10.1 <u>Airport Management Activities.</u> The Operator hereby acknowledges that from time to time it may be necessary or desirable for the Authority, the FAA or other public body to undertake construction, repair or other activities; or to make certain policy decisions related to the overall management and operation of Logan Airport that may temporarily close Logan Airport or portions thereof; relocate roadways, parking areas, long-term holding lots and terminal curbs; modify or eliminate certain entrances and exits from Logan Airport; or otherwise inconvenience or impair the Operator's activities at Logan Airport. In such event, the Operator agrees that no liability shall attach to the Authority, its officers, agents or employees as a result of any such inconvenience or impairment, and the Operator hereby waives any claim or cause of action for damages, lost profits, or other compensation or remedy, whether at law or in equity, arising out of or resulting from such actions by the Authority.

## ARTICLE 11 - DEFAULT AND TERMINATION

11.1 <u>Event of Default.</u> Any one or more of the following shall constitute a default by the Operator:

(a) any governmental authority, board, agency, or officer terminates or suspends any certificate, license, permit or authority without which Operator shall not be legally empowered to perform commercial ground transportation services at Logan Airport;

(b) the Operator fails to pay in full any amounts due to the Authority under this Operating Agreement on or before the date on which same becomes due and payable and the same continues for ten (10) days after written notice and demand for payment from the Authority thereof;

(c) the Operator fails to perform or observe any term or condition of the Operating Agreement which, because of its character, would immediately jeopardize the Authority's operations or expose the Authority to liability and the same continues for ten (10) days after written notice from the Authority (such as, but without limitation, any failure to maintain minimum insurance coverage or any action that would subject the Authority to liability or present a safety or security hazard);

-11-

(d) the Operator fails to perform or observe any other term or condition contained in this Operating Agreement within thirty (30) days after written notice of default from the Authority thereof, unless such default is of such a nature that it cannot be cured within such thirty (30) day period, in which event the Authority may, in its sole discretion, elect not to terminate the Operating Agreement so long as the Operator shall commence the curing of the default within such thirty (30) day period, and shall thereafter promptly and diligently prosecute the curing of same; or

(e) except as otherwise provided by applicable law, if the Operator shall be judicially declared bankrupt or insolvent according to law, or if any assignment shall be made of the property of the Operator for the benefit of creditors, or if receiver, guardian, conservator, trustee in involuntary bankruptcy or similar officer shall be appointed to take charge of all or any substantial part of the Operator's property by a court of competent jurisdiction, or if a petition shall be filed for the reorganization of the Operator under any provisions of law now or hereafter enacted, and such proceeding is not dismissed within forty-five (45) days after it is begun, or if the Operator shall file a petition for such reorganization, or for arrangements under any provisions of such laws providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts.

11.2 **Remedies.** Upon a default by Operator, the Authority may do one or more of the following:

(a) preclude and suspend Operator from picking up passengers at Logan Airport for such period of time as the Authority, in its sole discretion, shall determine;

(b) revoke all Vehicle Permits issued to Operator or its employees pursuant to Article 5.2; for such period of time as the Authority, in is sole discretion, shall determine.

(c) terminate this Operating Agreement by giving notice thereof to the Operator effective as of the date set forth in such notice; and

(d) exercise such other legal or equitable right or remedy that it may have.

-12-

11.3 **Damages:** The rights of the Authority under this Article 11. are in addition to, and not in limitation of, its right to terminate this Operating Agreement without cause pursuant to Article 2.2. If this Operating Agreement is terminated for any reason, Operator shall remain liable for any and all base rates, fees, charges, interest, costs, assessments, fines and damages which may be due hereunder or sustained as a result of the Operator's operations at Logan Airport and all costs, fees and expenses (including, without limitation, reasonable attorneys' and experts' fees and other expenses) incurred by the Authority in pursuit of its remedies hereunder.

## ARTICLE 12 - MISCELLANEOUS

12.1 **Not A Lease.** This Operating Agreement is not a lease and does not give the Operator any right to the use or occupancy of any specific areas of Logan Airport for the conduct of its activities or the storage of any equipment.

12.2 **Notice.** Whenever by the terms of this Operating Agreement notice shall or may be given, the same shall mean and include written notice. Written notice shall be deemed to have been duly served upon the Operator when delivered to or at the Operator's last known business address; or when enclosed in a postage prepaid wrapper, or envelopes, addressed to the Operator's last know business address and deposited in a United States mail box.

**If intended for the Authority, address to:**

Ground Transportation Manager or Designee
Massachusetts Port Authority
Boutwell 2
Logan International Airport
East Boston, Massachusetts 02128

With a copy to:

Chief Legal Counsel
Massachusetts Port Authority
State Transportation Building
10 Park Plaza
Boston, Massachusetts 02116

If intended for the Operator, mailing address set forth in Section 1.2.

-13-

12.3   **No Joint Venture.** The parties state that they have not created and do not intend to create by this Operating Agreement a joint venture or partnership relation between them but rather all services rendered pursuant to this Operating Agreement are rendered solely by Operator. Operator assumes sole responsibility for injury or damage to person or property arising out of the provision of the Permitted Services.

12.4   **No Waiver.** No waiver or failure to complain by the Authority or the Operator of any action, non-action or default on the part of the other in the performance of any of the terms, covenants, or conditions hereof to be performed, kept or observed shall be or be construed to be a waiver of any other or subsequent default in the performance of any of the terms, covenants and conditions. No Acceptance by Authority of any rates, fees, charges, or other payments in whole or in part for any period or periods after a default in any of the terms, covenants, and conditions to be performed, kept, or observed by Operator shall be deemed a waiver of any right on the part of the Authority to enforce such terms, covenants or conditions.

12.5   **Work in Harmony.** The Operator covenants that its employees at Logan Airport shall be able to work in harmony with all elements of labor employed at Logan Airport. In the event that the Authority determines that it is necessary for public safety or the efficient operation of Logan Airport to post police details or take other actions as a result of the inability of Operator's employees to work in harmony with other elements of labor employed at Logan Airport, the Operator shall reimburse the Authority for all reasonable costs incurred by the Authority in doing so.

12.6   **Authority Employees.** Operator shall not during the term of this Operating Agreement, hire or employ on either a full-time or part-time basis, any person or persons so long as such person shall be employed by the Authority.

12.7   **Certificate of Compliance With Certain Laws.** In compliance with certain provisions of state law, upon execution of this Operating Agreement, Operator shall furnish to the Authority a signed statement in the form attached hereto as Exhibit D.

12.8   **Non-Discrimination and Affirmative Action.** With respect to non-discrimination and affirmative action, Operator shall comply with all of the terms and conditions set forth in Exhibit E.

12.9   **No Personal Liability.** No member, director, officer, or employee of the Authority shall be charged personally or held contractually liable by or to Operator under any term or provision of this Operating Agreement or because of any breach thereof or because of its execution or attempted execution.

-14-

12.10 <u>Agreements With the United States.</u> This Operating Agreement is subject and subordinate to the provisions of any agreement heretofore or hereafter made between the Authority and the United States. The Operator shall reasonably abide by requirements of the agreements entered into between the Authority and the United States, and shall consent to amendments and modifications of this Operating Agreement if required by such agreement or if required as a condition of the Authority's entry into such agreement.

12.11 <u>Trust Agreement.</u> The Operator acknowledges that the Authority is a party to a Trust Agreement dated as of the first day of August, 1978 between the Authority and the holders of bonds issued by the Authority and State Street Bank and Trust Company as Trustee. The Operator agrees to consent to amendments or modifications to this Operating Agreement reasonably required in the opinion of legal counsel to the Authority who shall have recognized expertise in bond matters to assure the Authority's compliance with its obligations thereof, or with the obligations of successor or additional Trust Agreements into which the Authority may enter in the course of issuing additional or refunding bonds as permitted by law.

12.12 <u>Assignment and Delegation Prohibited.</u> Operator shall not assign or transfer this Operating Agreement or any interest or rights herein, voluntarily or by operation of law. Any attempted assignment or transfer of this Operating Agreement shall be void and shall, at the Authority's option, terminate this Operating Agreement. Operator shall not delegate any of its Permitted Services, duties, or responsibilities under this Operating Agreement without the prior written approval of the Authority. Any delegation without such approval shall be void and shall, at the Authority's option, terminate this Operating Agreement.

12.13 <u>Non-Exclusive Rights.</u> The Operator hereby acknowledges that the rights granted under this Operating Agreement are non-exclusive and that nothing herein shall be construed as granting or authorizing the grant of an exclusive right within the meaning of 49 U.S.C. Sections 2210 and 1349, as amended, or in violation of any other provision of law.

-15-

12.14 **Entire Agreement/Applicable Law.** This Operating Agreement constitutes the entire agreement between the parties and supersedes all prior agreements between them with respect to the subject matter of this Operating Agreement. No subsequent alteration, amendment, change or addition to this Operating Agreement shall be binding upon the Authority or the Operator unless reduced to writing and signed by the party or parties to be charged therewith. If any provision of this Operating Agreement shall to any extent be held invalid or unenforceable, the remainder of this Operating Agreement shall not be affected thereby unless one or both parties would be substantially and materially prejudiced thereby. This Operating Agreement and the rights and obligations of the parties hereunder shall be governed by the laws of the Commonwealth of Massachusetts.

Executed as of the dates appearing below.

OPERATOR  
By: _[signature]_ James M. Talbot  
Title: PRESIDENT  
Date: March 2, 1995

MASSACHUSETTS PORT AUTHORITY  
By: _[signature]_ Mark Chiarando  
Title: Manager of Transportation Services  
Date: 4·10·95

## EXHIBIT A

### (Operational Procedures)

Exhibit A shall consist of the following documents attached hereto and as they may be changed or supplemented by the Authority, in its sole discretion, from time to time, upon twenty-four (24) hours prior notice to Operator:

1. Drop off and Pick up Procedures for Scheduled Motor Bus and Limousine Operators

2. Drop off and Pick up Procedures for Non Scheduled Limousine Operators, Reservation Limousine Operators and Shared Van Service Operators

3. Drop off and Pick up Procedures for Charter and Tour Motor Bus Operators

4. Drop off and Pick up Procedures for Delivery Vehicle Operators

5. Drop off and Pick up Procedures for Authorized Courtesy Vehicle Operators

6. Description of Long Term Waiting Area

7. Procedures for Terminal Passenger Greeters

8. Procedures for Tour Operators

9. Map of Long Term Waiting Area

# EXHIBIT C

MASSPORT, LOGAN INTERNATIONAL AIRPORT, EAST BOSTON, MA 02128, (617) 973-5500



November 3, 1992

Mr. Walter Jalbert
C & J Trailways
P.O. Box 190
Dover, NH  03820

Dear Mr. Jalbert:

As you are aware; the new base rate for Commercial Ground Transportation operators conducting a scheduled service at Logan Airport will be effective on January 1, 1993.

A meeting will be held on November 18, 1992, at 2:00 p.m. in the Massport Media Room. The focus of this meeting will be an explanation of the trip rate structure and the impact this will have on your operation.

Due to the importance of this meeting, it is required that you or a representative attend. The number of scheduled trips will be the basis for computing your company's monthly user fee. Please have the number of the inbound and outbound trips that service Logan, with you at this time. Your cooperation is greatly appreciated.

Sincerely yours,

MASSACHUSETTS PORT AUTHORITY

John R. Faro
Manager,
Ground Transportation Unit

JRF/dal

4505C

# EXHIBIT D



# MASSACHUSETTS PORT AUTHORITY
## INVOICE

Please Remit To:
MASSACHUSETTS PORT AUTHORITY
P. O. BOX 5853
BOSTON MA 02206
United States

| | |
|---|---|
| Page: | 1 |
| Invoice No: | LT00065634 |
| Invoice Date: | 01/07/2004 |
| Customer Number: | 2056 |
| Due Date: | 02/11/2004 |

Customer:
C & J TRAILWAYS
ATTN: VIRGINIA BERGERON
185 GRAFTON DRIVE
PORTSMOUTH NH 03801
United States

AMOUNT DUE:     469.50  USD

Amount Remitted

For billing questions, please call  617-428-2800

| Line | Adj | Description | Quantity | UOM | Unit Amt | Net Amount |
|---|---|---|---|---|---|---|
| | | PERIOD BEING BILLED: DECEMBER, 2003 | | | | |
| 1 | | Limousine/Bus Trips | 1.00 | EA | 469.5000 | 469.50 |
| | | Total number of trips: 313 @ $1.50 per Trip | | | | |
| | | SUBTOTAL: | | | | 469.50 |

TOTAL AMOUNT DUE :                                                              469.50



ENTERED

Exhibit "E"

GROUND TRANSPORTA[TION]
MARKETING A[GREEMENT]

by and between

MASSACHUSETTS PORT AUTHORITY

and

C & J TRAILWAYS

AGREEMENT NO: L-1750

ENTERED AS OF: December 31, 1991    EXPIRY DATE: December 31, 1992

This Agreement made and entered into by and between the Massachusetts Port Authority (hereinafter referred to as the "Authority"), a body politic and corporate organized and existing in accordance with Chapter 465 of the Massachusetts Acts of 1956 and amendments thereto, and C & J Trailways, a corporation organized under the laws of New Hampshire, with a principal place of business at P.O. Box 190, Dover, New Hampshire 03820, (hereinafter referred to as "Operator").

WITNESSETH:

WHEREAS, Authority is the owner and operator of Logan International Airport (hereinafter referred to as "Airport") located in Suffolk County in the Commonwealth of Massachusetts; and

WHEREAS, Operator engages in commercial ground transportation services and has a valid agreement with the Authority to conduct such services on the Airport; and

WHEREAS, Authority desires that passengers at the Airport have convenient and reliable ground transportation service options; and

WHEREAS, Authority desires that vehicle trips in and out of the Airport be reduced while capacity be increased in order to reduce congestion and improve air quality; and

WHEREAS, Authority desires to work with ground transportation operators who operate high capacity vehicles and provide efficient and reliable service in an experimental program to increase passengers through marketing and other mechanisms; and

WHEREAS, Operator agrees to provide efficient and reliable service; and

WHEREAS, Operator desires to participate in the Authority's experimental marketing program,