# ROSS EXHIBITS

# PART #2

Case 1:04-cv-10486-MBB   Document 14-3   Filed 04/01/2004   Page 1 of 15

-10-

## ARTICLE 10 - AIRPORT OPERATIONS

10.1 <u>Airport Management Activities.</u>  The Operator hereby acknowledges that from time to time it may be necessary or desirable for the Authority, the FAA or other public body to undertake construction, repair or other activities; or to make certain policy decisions related to the overall management and operation of Logan Airport that may temporarily close Logan Airport or portions thereof; relocate roadways, parking areas, long-term holding lots and terminal curbs; modify or eliminate certain entrances and exits from Logan Airport; or otherwise inconvenience or impair the Operator's activities at Logan Airport.  In such event, the Operator agrees that no liability shall attach to the Authority, its officers, agents or employees as a result of any such inconvenience or impairment, and the Operator hereby waives any claim or cause of action for damages, lost profits, or other compensation or remedy, whether at law or in equity, arising out of or resulting from such actions by the Authority.

## ARTICLE 11 - DEFAULT AND TERMINATION

11.1 <u>Event of Default.</u>  Any one or more of the following shall constitute a default by the Operator:

 (a) any governmental authority, board, agency, or officer terminates or suspends any certificate, license, permit or authority without which Operator shall not be legally empowered to perform commercial ground transportation services at Logan Airport;

 (b) the Operator fails to pay in full any amounts due to the Authority under this Operating Agreement on or before the date on which same becomes due and payable and the same continues for ten (10) days after written notice and demand for payment from the Authority thereof;

 (c) the Operator fails to perform or observe any term or condition of the Operating Agreement which, because of its character, would immediately jeopardize the Authority's operations or expose the Authority to liability and the same continues for ten (10) days after written notice from the Authority (such as, but without limitation, any failure to maintain minimum insurance coverage or any action that would subject the Authority to liability or present a safety or security hazard);

-11-

    (d)   the Operator fails to perform or observe any other term or condition contained in this Operating Agreement within thirty (30) days after written notice of default from the Authority thereof, unless such default is of such a nature that it cannot be cured within such thirty (30) day period, in which event the Authority may, in its sole discretion, elect not to terminate the Operating Agreement so long as the Operator shall commence the curing of the default within such thirty (30) day period, and shall thereafter promptly and diligently prosecute the curing of same; or

    (e)   except as otherwise provided by applicable law, if the Operator shall be judicially declared bankrupt or insolvent according to law, or if any assignment shall be made of the property of the Operator for the benefit of creditors, or if receiver, guardian, conservator, trustee in involuntary bankruptcy or similar officer shall be appointed to take charge of all or any substantial part of the Operator's property by a court of competent jurisdiction, or if a petition shall be filed for the reorganization of the Operator under any provisions of law now or hereafter enacted, and such proceeding is not dismissed within forty-five (45) days after it is begun, or if the Operator shall file a petition for such reorganization, or for arrangements under any provisions of such laws providing a plan for a debtor to settle, satisfy or extend the time for the payment of debts.

11.2   <u>Remedies.</u>  Upon a default by Operator, the Authority may do one or more of the following:

    (a)   preclude and suspend Operator from picking up passengers at Logan Airport for such period of time as the Authority, in its sole discretion, shall determine;

    (b)   revoke all Vehicle Permits issued to Operator or its employees pursuant to Article 5.2; for such period of time as the Authority, in is sole discretion, shall determine.

    (c)   terminate this Operating Agreement by giving notice thereof to the Operator effective as of the date set forth in such notice; and

    (d)   exercise such other legal or equitable right or remedy that it may have.

-12-

11.3 <u>Damages:</u> The rights of the Authority under this Article 11. are in addition to, and not in limitation of, its right to terminate this Operating Agreement without cause pursuant to Article 2.2. If this Operating Agreement is terminated for any reason, Operator shall remain liable for any and all base rates, fees, charges, interest, costs, assessments, fines and damages which may be due hereunder or sustained as a result of the Operator's operations at Logan Airport and all costs, fees and expenses (including, without limitation, reasonable attorneys' and experts' fees and other expenses) incurred by the Authority in pursuit of its remedies hereunder.

## ARTICLE 12 - MISCELLANEOUS

12.1 <u>Not A Lease.</u> This Operating Agreement is not a lease and does not give the Operator any right to the use or occupancy of any specific areas of Logan Airport for the conduct of its activities or the storage of any equipment.

12.2 <u>Notice.</u> Whenever by the terms of this Operating Agreement notice shall or may be given, the same shall mean and include written notice. Written notice shall be deemed to have been duly served upon the Operator when delivered to or at the Operator's last known business address; or when enclosed in a postage prepaid wrapper, or envelopes, addressed to the Operator's last know business address and deposited in a United States mail box.

<u>If intended for the Authority, address to:</u>

Ground Transportation Manager or Designee
Massachusetts Port Authority
Boutwell 2
Logan International Airport
East Boston, Massachusetts  02128

With a copy to:

Chief Legal Counsel
Massachusetts Port Authority
State Transportation Building
10 Park Plaza
Boston, Massachusetts  02116

If intended for the Operator, mailing address set forth in Section 1.2.

-13-

12.3 <u>No Joint Venture.</u>  The parties state that they have not created and do not intend to create by this Operating Agreement a joint venture or partnership relation between them but rather all services rendered pursuant to this Operating Agreement are rendered solely by Operator. Operator assumes sole responsibility for injury or damage to person or property arising out of the provision of the Permitted Services.

12.4 <u>No Waiver.</u>  No waiver or failure to complain by the Authority or the Operator of any action, non-action or default on the part of the other in the performance of any of the terms, covenants, or conditions hereof to be performed, kept or observed shall be or be construed to be a waiver of any other or subsequent default in the performance of any of the terms, covenants and conditions.  No Acceptance by Authority of any rates, fees, charges, or other payments in whole or in part for any period or periods after a default in any of the terms, covenants, and conditions to be performed, kept, or observed by Operator shall be deemed a waiver of any right on the part of the Authority to enforce such terms, covenants or conditions.

12.5 <u>Work in Harmony.</u>  The Operator covenants that its employees at Logan Airport shall be able to work in harmony with all elements of labor employed at Logan Airport.  In the event that the Authority determines that it is necessary for public safety or the efficient operation of Logan Airport to post police details or take other actions as a result of the inability of Operator's employees to work in harmony with other elements of labor employed at Logan Airport, the Operator shall reimburse the Authority for all reasonable costs incurred by the Authority in doing so.

12.6 <u>Authority Employees.</u>  Operator shall not during the term of this Operating Agreement, hire or employ on either a full-time or part-time basis, any person or persons so long as such person shall be employed by the Authority.

12.7 <u>Certificate of Compliance With Certain Laws.</u>  In compliance with certain provisions of state law, upon execution of this Operating Agreement, Operator shall furnish to the Authority a signed statement in the form attached hereto as Exhibit D.

12.8 <u>Non-Discrimination and Affirmative Action.</u>  With respect to non-discrimination and affirmative action, Operator shall comply with all of the terms and conditions set forth in Exhibit E.

12.9 <u>No Personal Liability.</u>  No member, director, officer, or employee of the Authority shall be charged personally or held contractually liable by or to Operator under any term or provision of this Operating Agreement or because of any breach thereof or because of its execution or attempted execution.

-14-

12.10 <u>Agreements With the United States.</u> This Operating Agreement is subject and subordinate to the provisions of any agreement heretofore or hereafter made between the Authority and the United States. The Operator shall reasonably abide by requirements of the agreements entered into between the Authority and the United States, and shall consent to amendments and modifications of this Operating Agreement if required by such agreement or if required as a condition of the Authority's entry into such agreement.

12.11 <u>Trust Agreement.</u> The Operator acknowledges that the Authority is a party to a Trust Agreement dated as of the first day of August, 1978 between the Authority and the holders of bonds issued by the Authority and State Street Bank and Trust Company as Trustee. The Operator agrees to consent to amendments or modifications to this Operating Agreement reasonably required in the opinion of legal counsel to the Authority who shall have recognized expertise in bond matters to assure the Authority's compliance with its obligations thereof, or with the obligations of successor or additional Trust Agreements into which the Authority may enter in the course of issuing additional or refunding bonds as permitted by law.

12.12 <u>Assignment and Delegation Prohibited.</u> Operator shall not assign or transfer this Operating Agreement or any interest or rights herein, voluntarily or by operation of law. Any attempted assignment or transfer of this Operating Agreement shall be void and shall, at the Authority's option, terminate this Operating Agreement. Operator shall not delegate any of its Permitted Services, duties, or responsibilities under this Operating Agreement without the prior written approval of the Authority. Any delegation without such approval shall be void and shall, at the Authority's option, terminate this Operating Agreement.

12.13 <u>Non-Exclusive Rights.</u> The Operator hereby acknowledges that the rights granted under this Operating Agreement are non exclusive and that nothing herein shall be construed as granting or authorizing the grant of an exclusive right within the meaning of 49 U.S.C. Sections 2210 and 1349, as amended, or in violation of any other provision of law.

Case 1:04-cv-10486-MBB   Document 14-3   Filed 04/01/2004   Page 7 of 15

-15-

12.14 <u>Entire Agreement/Applicable Law.</u> This Operating Agreement constitutes the entire agreement between the parties and supersedes all prior agreements between them with respect to the subject matter of this Operating Agreement. No subsequent alteration, amendment, change or addition to this Operating Agreement shall be binding upon the Authority or the Operator unless reduced to writing and signed by the party or parties to be charged therewith. If any provision of this Operating Agreement shall to any extent be held invalid or unenforceable, the remainder of this Operating Agreement shall not be affected thereby unless one or both parties would be substantially and materially prejudiced thereby. This Operating Agreement and the rights and obligations of the parties hereunder shall be governed by the laws of the Commonwealth of Massachusetts.

Executed as of the dates appearing below.

| OPERATOR | MASSACHUSETTS PORT AUTHORITY |
|---|---|
| By: *Jim Sage* | By: _____ |
| Title: *Manager-Insurance & Safety Services* | Title: _____ |
| Date: *November 23, 1993* | Date: _____ |

## EXHIBIT A

### (Operational Procedures)

Exhibit A shall consist of the following documents attached hereto and as they may be changed or supplemented by the Authority, in its sole discretion, from time to time, upon twenty-four (24) hours prior notice to Operator:

1. Drop off and Pick up Procedures for Scheduled Motor Bus and Limousine Operators

2. Drop off and Pick up Procedures for Non-Scheduled Limousine Operators, Reservation Limousine Operators and Shared Van Service Operators

3. Drop off and Pick up Procedures for Charter and Tour Motor Bus Operators

4. Drop off and Pick up Procedures for Delivery Vehicle Operators

5. Drop off and Pick up Procedures for Authorized Courtesy Vehicle Operators

6. Description of Long Term Waiting Area

7. Procedures for Terminal Passenger Greeters

8. Procedures for Tour Operators

9. Map of Long Term Waiting Area

1. <u>Drop Off And Pick Up Procedures For Scheduled Motor Bus And Limousine Operators</u>

   Except at Terminal E, all scheduled bus and limousine drivers will use the second level to drop off passengers who are boarding aircraft to depart Logan Airport. At Terminal E, drop off is at the designated stop, not at the inner curb.

   After dropping off passengers, the bus and limousine drivers shall check for any items left by passengers, such as luggage, eyeglasses, clothing, etc. Any items found shall be turned into the Massachusetts State Police at Logan Airport (Terminal D).

   The scheduled bus and limousine drivers must return to the long term waiting area to wait until their scheduled time of departure, and then proceed to Terminal A and subsequent terminals to commence passenger pick ups, outbound from Logan Airport.

   The scheduled bus and limousine driver will start their outbound trip from Terminal A. They will stop at the designated limousine, bus, or courtesy vehicle stand in front of each terminal. Each driver shall announce their authorized destination and assist passengers in loading their luggage. Only one trip through the terminals is allowed. At Terminal E the scheduled bus and limousine driver shall leave Logan Airport by the most direct route.

   Scheduled service Operators performing charters shall abide by the charter and tour guidelines.

2. <u>Drop off and Pick up Procedures for Non-Scheduled Limousine Operators, Reservation Limousine Operators and Shared Van Service Operators</u>

   Non-scheduled limousine drivers, reservation limousine drivers and shared van service drivers shall drop off outbound passengers on the second level (departure) at the baggage check-in area (Terminal C drop off is the second island and Terminal E drop off is the third island). Drivers should check vehicles for lost items, which if found should be returned to the Massachusetts State Police at Logan Airport (Terminal D). If there is no scheduled pick up, drivers must leave Logan Airport by the most direct route.

   When non-scheduled service drivers are picking up passengers, the drivers must go to the long term waiting area and sign in with the Ground Transportation Agent by giving the company name, permit number, airline, time of pick-up, destination and number of passengers. At this point, a long term waiting area ticket shall be given to the drivers. This ticket should be prominently displayed on the left side of the windshield.

   Limousine and/or van drivers must wait at the long term waiting area until the flight they are meeting has arrived and passengers are ready to be picked up. Drivers may then proceed to the designated limousine, bus, courtesy or taxicab stand and load passengers and luggage.

-3-

3. <u>Drop off and Pick up Procedures for Charter and Tour Motor Bus Operators</u>

All charter and tour motor bus drivers when dropping off passengers are required to use the departure level (except Terminal E, where passenger drop off and pick up are against the blast wall at the end of the terminal).

For passenger pick ups, charter and motor tour bus drivers must register at the long term waiting area. Drivers must sign-in by giving the Ground Transportation Agent, the company name, permit number, airline, number of passengers, time of arrival, and destination. Tour guides or greeters may be dropped off at the terminal prior to registering.

Drivers will wait at the long term waiting area until the flight has arrived and all passengers have claimed their luggage and are ready to board the bus. The tour guide may request the charter and tour motor bus by calling the long term waiting area at 561-1770 or by contacting the Ground Transportation Agent to call the base via radio. Drivers will stop at the designated charter bus stand, load luggage, board passengers and leave Logan Airport. Charter and tour motor bus drivers are not allowed to park and wait at the curb. Tour guides are not allowed to call for buses until all passengers are on the curb with their luggage.

4. <u>Drop off and Pick up Procedures for Delivery Vehicle Operators</u>

All service delivery vehicle drivers will advise the Authority's Ground Transportation Unit of the amount of monthly trips made for the month, in writing.

Courier and service delivery vehicle drivers shall park permitted vehicles at designated package and delivery stand only. The time limit is 15 minutes.

Van or limousine drivers authorized to provide delivery vehicle service shall follow the above procedures provided that:

o   They have a current Massport identification decal.
o   They do not pick up passengers in the vehicle.

Drivers are allowed to enter the terminals to pick up and/or deliver packages only.

5. <u>Drop off and Pick up Procedures For Authorized Courtesy Vehicle Operators</u>

Courtesy vehicle drivers are encouraged to make all of their drop offs on the upper level of the terminals. Pick ups and/or drop offs at the lower level of the terminals are to be made at the designated courtesy vehicle stand only.

-4-

6. <u>Description of Long Term Waiting Area</u>

The currently designated long term waiting area ("LTWA") is the parking area between the u-turn in front of the Central Parking Garage and the former Bay Bank Building. This is also known as the limo pool or holding area. See attached map.

The trailer/drivers room in this area is available for use by drivers using the LTWA. The facility has restrooms, vending machines, pay phones, and a flight information display screen showing flight arrivals, delays and cancellation.

Each driver who is authorized to conduct Permitted Services at Logan Airport shall register at the trailer/office prior to any passenger pick ups and shall obtain a ticket authorizing them to use the appropriate commercial vehicle stand.

Scheduled motor buses and limousine drivers may utilize the trailer/drivers room but are not required to register at the trailer/office unless they are picking up a charter group.

7. <u>Procedures for Terminal Passenger Greeters</u>

Drivers shall not be allowed to act in the dual role of driver and passenger greeter. In order to alleviate confusion, drivers and passenger greeters are requested to sign-in at the LTWA and advise the Ground Transportation Agent that a passenger greeter will be coordinating the pick up. The driver shall drop the passenger greeter off at the terminal and proceed back to the LTWA to wait for the arrival of their flight.

Passenger greeters are required to remain on the lower level, at the baggage claim area. After making customer contact, passenger greeters may call for their limousine using their own radio or by requesting the Ground Transportation Agent to call the LTWA.

Harassing, annoying or soliciting Logan Airport passengers by a passenger greeter is a violation of the Authority's Commercial Ground Transportation Service Rules and Regulations. Anyone found doing so will be subject to disciplinary action by the Authority.

-5-

8. <u>Procedures for Tour Operators</u>

All charter bus drivers shall register with the dispatcher at the LTWA. The bus driver shall give the dispatcher the flight number, airline name and scheduled arrival time. The dispatcher will notify the Ground Transportation Manager who will then make the required tour arrangement with the Ground Transportation Agent at the specific airline terminal.

The tour driver or guide, after meeting the tour group, and making sure that everyone has their luggage and is ready to leave Logan Airport, should approach the Ground Transportation Agent located at the designated commercial vehicle stand and request that the charter bus be sent to the terminal.

Tour guides are also encouraged to use the public address system located at each commercial vehicle stand, to assist in locating their group. The Ground Transportation Agent is in radio contact with the LTWA and a Ground Transportation Supervisor. If any difficulties arise the Ground Transportation Agent is available to provide assistance.

There are also Public Information Representatives located in Terminals A, C, and E, who are also able to contact the LTWA.

EXHIBIT B

OPERATING AGREEMENT
COMMERCIAL GROUND TRANSPORTATION SERVICE BASE RATES PER TRIP

All Operators shall pay **$25.00 per month** or the number of monthly trips times the base rate per trip in effect for the current year, whichever is greater. Each Operator shall also pay applicable Operating Agreement Fees which shall consist of (i) Initial **Application Fee of $75.00** and (ii) **Annual Renewal Fee of $30.00**.

| TIME FRAME | ALL OPERATORS WITH OPERATING AGREEMENT | AUTHORIZED COURTESY VEHICLES (2) 500 Trips/Mo. and above |
|---|---|---|
| Year 1<br><br>1993 | Base Rate = $1.25 | $1.25<br>x<br>Actual # Trips<br>x<br>30% |
| Year 2<br><br>1994 | Base Rate =<br>Year 1 Rate<br>($1.25)<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips<br>x<br>60% |
| Year 3<br><br>1995 | Base Rate =<br>Year 2 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |
| Year 4<br><br>1996 | Base Rate =<br>Year 3 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |
| Year 5 (1)<br><br>1997 | Base Rate =<br>Year 4 Rate<br>x<br>CPI | Base Rate<br>x<br>Actual # Trips |

(1) To adjust Base Rates after Year 5, the Authority shall conduct public hearings. If not, then Base Rates will remain at year 5 level.

(2) For all Operators of Authorized Courtesy Vehicles making more than 500 trips per month, the Base Rate Per Trip shall be discounted by 70% in Year 1 and 40% in Year 2. In Year 1 and Year 2, each Operator shall be billed only for 30% and 60% of their monthly trips.

**EXHIBIT D**



# MASSACHUSETTS PORT AUTHORITY
## INVOICE

Please Remit To:

MASSACHUSETTS PORT AUTHORITY
P. O. BOX 5853
BOSTON MA 02206
United States

| | |
|---|---|
| Page: | 1 |
| Invoice No: | LT00065586 |
| Invoice Date: | 01/07/2004 |
| Customer Number: | 1842 |
| Due Date: | 02/11/2004 |

Customer:

BONANZA ACQUISITION, LLC
ATTN: ACCOUNTS PAYABLE
P.O. BOX 9527
PROVIDENCE RI 02940-9527
United States

AMOUNT DUE:        906.00   USD

_____
Amount Remitted

For billing questions, please call 617-428-2800

| Line | Adj | Description | Quantity | UOM | Unit Amt | Net Amount |
|---|---|---|---|---|---|---|
| | | PERIOD BEING BILLED: DECEMBER, 2003 | | | | |
| 1 | | Limousine/Bus Trips | 1.00 | EA | 906.0000 | 906.00 |
| | | Total number of trips: 604 @ $1.50 per Trip | | | | |
| | | **SUBTOTAL:** | | | | 906.00 |

| TOTAL AMOUNT DUE : | 906.00 |
|---|---|



PORTRAIT                                                   Original

OVERDUE INVOICES ARE SUBJECT TO A FINANCE CHARGE OF 1.5% PER MONTH